[Crim. No. 6746. Second Dist., Div. One. Sept. 2, 1960.]

THE PEOPLE, Respondent, v. MONTE GLENNWOOD MASON et al., Appellants.

Russell E. Parsons and Edward L. Gritz for Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

FOURT, J.—An indictment was returned on December 16, 1957, by the Grand Jury of Los Angeles County. The indictment consisted of some 19 counts. Appellants (who are husband and wife) and one Clyde D. Moslander, Jr., were charged in Count I with conspiring together and with several other persons to cheat and defraud by criminal means, to obtain money and property by false pretenses and false

promises[1]; to commit grand theft[2]; and to violate the corporate securities law[3], commencing on or about October, 1948, and continuing up to the finding of the indictment.

In connection with Count I, some 18 overt acts were alleged.[4]

---

[1]Penal Code, section 182, subdivision 4, provides:

"If two or more persons conspire:

" . . . . . . . . . . .

"4. To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises."

[2]Penal Code, section 487, subdivision 1, provides:

"Grand theft is theft committed in any of the following cases:

"1. When the money, labor or real or personal property taken is of a value exceeding two hundred dollars ($200); . . ."

[3](A) Corporations Code, section 25009, subdivision (a):

" (a) 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value.

" 'Sale' or 'sell' includes all of the following, whether done directly or by an agent, circular letter, advertisement, or otherwise: An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities."

(B) Corporations Code, section 26104, subdivision (a):

"Every officer, agent, or employee of any company and every other person, who does any of the following acts is guilty of a public offense punishable by imprisonment in a state prison not exceeding five years, or in a county jail not exceeding two years, or by a fine not exceeding five thousand dollars ($5,000), or by both such fine and imprisonment:

"(a) [Issuance or sale of security with permit.] Knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this division, or of the Constitution of this State."

"'Overt Act No. 1

"In pursuance of such conspiracy and to effect the object of the same, the said defendant, Monte G. Mason, and others filed and caused to be filed, on or about October 29, 1948, Articles of Incorporation of *Cane Creek Petroleum, Inc.,* in the office of the Secretary of State at Salt Lake City, Utah.

"Overt Act No. 2

"In pursuance of such conspiracy . . . on or about April 28, 1950, Articles of Incorporation of the *Americol Petroleum, Inc.* (were filed), in the office of the Secretary of State of Colorado, at Denver, Colorado.

"Overt Act No. 3

"In pursuance of such conspiracy . . . on or about May 22, 1952, Articles of Incorporation of the *M.G.M. Petroleum, Inc.* (were filed), in the office of the Secretary of State of Nevada, at Carson City, Nevada.

"Overt Act No. 4

"In pursuance of such conspiracy . . . on or about March 31, 1954, Articles of Incorporation of the Modco, Inc. (were filed), in the office of the Secretary of State of Nevada, at Carson City, Nevada.

"Overt Act No. 5

"In pursuance of such conspiracy . . . the said defendant, Monte G. Mason, and his co-conspirator, Robert S. Ross, did, on or about March

In Count II it was alleged that appellants and Clyde D.

1, 1951, call at the South Gate Chapel in South Gate, California, and made purported pledges totaling $100,000.00 to the building fund of said church (none of which was ever paid), then the said defendants, Monte G. Mason and Robert S. Ross, thereafter sold many thousands of shares of stock of Americol Petroleum, Inc., to the members and friends of said church.

"Overt Act No. 6

"In pursuance of such conspiracy . . . Monte G. Mason, did, in Los Angeles County, on or about 1950, sell a 10% interest in his alleged oil leases near Moab, Utah, to one E. P. Werner and a Mr. Frick for $7,500.00.

"Overt Act No. 7

"In pursuance of such conspiracy . . . Monte G. Mason, did, in Los Angeles County, on or about 1951, sell to one Eric Liedberg shares of stock in Americol Petroleum, Inc., and M.G.M. Petroleum, Inc., aggregating $11,000.00.

"Overt Act No. 8

"In pursuance of such conspiracy . . . Monte G. Mason, held a meeting at his home in North Hollywood on or about October 9, 1952, at which time Monte G. Mason, together with one Ralph Hunt and one Henry Sorenson, showed moving pictures of the alleged oil well purportedly owned by the M.G.M. Petroleum, Inc., and represented that the said well, at that time, was producing 9,800 barrels of oil and more than one million cubic feet of gas per day, and that the Americol Petroleum, Inc., was the parent corporation of M.G.M. Petroleum, Inc.; these representations were made to and in the presence of Atty. *Houston Slate* and Dr. Ross Huntley.

"Overt Act No. 9

"In pursuance of such conspiracy . . . one Roy Jarman introduced one Pat J. Pellegrino to the defendant, Monte G. Mason, sometime in the Fall of 1951 at which time he, Pellegrino, purchased $3,000.00 worth of stock in Americol Petroleum, Inc., from the said Monte G. Mason in South Gate, California.

"Overt Act No. 10

"In pursuance of such conspiracy . . . the said defendants and their agents solicited and sold to one Ralph W. James and members of his family of Pasadena, California, during the year 1953, shares of stock in both Americol Petroleum, Inc., and M.G.M. Petroleum, Inc., aggregating more than $100,000.00.

"Overt Act No. 11

"In pursuance of such conspiracy . . . the said defendants, and their agents, solicited and sold shares of stock to one Wesley J. Durston in Las Vegas, Nevada and Moab, Utah, in Americol Petroleum, Inc., M.G.M. Petroleum, Inc., and Modco, Inc., aggregating approximately $143,000.00, during the years 1954 and 1955, and also, said defendants induced the said Durston to act as their agent in the sale of stock and collecting monies therefor in Los Angeles County, California, aggregating many thousands of dollars, which monies he either gave to defendants in person or wired to them by Western Union Telegraph Company.

"Overt Act No. 12

"In pursuance of such conspiracy . . . Wesley J. Durston took one Willis E. McKnight to Moab, Utah to see the purported well then being drilled by Modco, Inc., on or about March 3, 1955, at which time he, McKnight, agreed to accept stock for two previous loans of $2,000.00 each in Modco, Inc., and again on March 12, 1955, he issued another check in

Moslander, Jr., violated the Corporate Securities Law[5] in that appellants sold a security, to wit, shares of stock in Americol Petroleum, Inc., M.G.M. Petroleum, Inc., and Modco, Inc., to Frank E. Teter for $2,370 on or about April 20, 1955, without first having applied for and secured from the Com-

---

Los Angeles County for $10,000.00 made payable to one WES DURSTON for stock in Americol Petroleum, Inc., and M.G.M. Petroleum, Inc.

"OVERT ACT NO. 13

"In pursuance of such conspiracy . . . MONTE G. MASON, went to the home of one WILLIS E. MCKNIGHT in Glendora, California, where a group of people were gathered and defendant MASON showed his moving pictures of the alleged oil wells at Moab, Utah, on or about April 19, 1955, including the Modco, Inc. well, at which time MASON sold shares of stock to a group of people and Mr. McKnight wired $6,500.00 to the First National Bank at Moab, Utah at MASON'S request on April 20, 1955.

"OVERT ACT NO. 14

"In pursuance of such conspiracy . . . MONTE G. MASON and one J. P. CUNNINGHAM, did, on or about January 3, 1955 in Los Angeles County, pick up checks totaling $15,000.00 from a number of investors for whom one ANGUS C. MCBAIN was acting as trustee in payment for stock in Modco, Inc., a Nevada corporation.

"OVERT ACT NO. 15

"In pursuance of such conspiracy . . . MONTE G. MASON and one J. P. CUNNINGHAM, did, on or about January 20, 1955, receive approximately $5,000.00 for sale of stock in Modco, Inc., from one DR. IRVING WILLS of Santa Barbara, and deposited said check in the account of said J. P. CUNNINGHAM in Los Angeles, and thereafter, said money was disbursed in large part for various and sundry purposes, other than for corporation purposes.

"OVERT ACT NO. 16

"In pursuance of such conspiracy . . . MONTE G. MASON and one J. P. CUNNINGHAM did, on or about February 7, 1955, receive a check in the sum of $5,000.00 from one DR. FRANK J. HOMBACH of Santa Barbara in payment for shares of stock in Modco, Inc., a Nevada corporation, said check being deposited in the personal bank account of said J. P. CUNNINGHAM and a large portion of which was disbursed for various and sundry purposes, other than for corporation purposes.

"OVERT ACT NO. 17

"In pursuance of such conspiracy . . . MONTE G. MASON did, on or about April 19, 1955, show pictures of the alleged oil well at Moab, Utah, at the home of WILLIS E. MCKNIGHT, in Glendora, California, and represented to one HAL G. WORKMAN and others present that he, MASON, was selling a block of his own personally owned stock to get money for the benefit of the corporation.

"OVERT ACT NO. 18

"In pursuance of such conspiracy . . . MONTE G. MASON did, on or about May 9, 1956, at 506 Ocean Front, Santa Monica, California, show pictures of his alleged oil wells at Moab, Utah, and make representations that one of his alleged oil wells flowed 9,856 barrels of oil through a ten sixty-fourth inch choke and also, 3,226,000 cubic feet of gas per day. These representations were made in the presence of Phillip C. McKenna, Mrs. Carol McKenna and Tom Hodge.''

[5]Corporations Code, section 26104, subdivision (a). (See footnote 3(B), *supra.*)

328

missioner of Corporations of the State of California a permit to do so.

In Count III it was alleged that appellants, and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to William Kirkland for $2,370 on or about April 20, 1955, without a permit.

In Count IV it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Ervin E. Yoder, Jr., for $3,950 on or about April 21, 1955, without a permit.

In Count V it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Edgar H. Mueller for $3,950 on or about April 21, 1955, without a permit.

In Count VI it was alleged that appellants and Moslander, committed grand theft by taking the sum of $5,000 from Willis E. McKnight on or about June 11, 1955.

In Count VII it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Edwin A. Mayer for $2,686 on or about April 20, 1955, without a permit.

In Count VIII it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to John B. Marlin for $1,343 on or about April 20, 1955, without a permit.

In Count IX it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Modco to C. F. Shemely for $680 on or about April 20, 1955, without a permit.

In Count X it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Edgar H. Mueller for $2,657 on or about May 31, 1955, without a permit.

In Count XI it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Ervin E. Yoder, Jr., for $2,657 on or about June 1, 1955, without a permit.

In Count XII it was alleged that Appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol and M.G.M. to Dr. Robert O. Pearman for $2,970 on or about March 17, 1955, without a permit.

In Count XIII it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Modco to Angus C. McBain, Trustee, for $15,000 on or about January 3, 1955, without a permit.

In Count XIV it was alleged that appellants and Moslander, committed grand theft by taking the sum of $15,000 from Angus C. McBain, Trustee, on or about March 18, 1955.

In Count XV it was alleged that Appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Angus C. McBain, Trustee, for $38,950 on or about March 1, 1955, without a permit.

In Count XVI it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Angus C. McBain, Trustee, for $27,300 on or about March 8, 1955, without a permit.

Counts XVII and XVIII were dismissed on motion of the People.

In Count XIX, it was alleged that appellants and Moslander, in violation of the Corporate Securities Law, sold shares of stock in Americol, M.G.M., and Modco to Clarence I. Tubbs for $1,343 on or about April 21, 1955, without a permit.

As to appellant Monte G. Mason it was alleged that he had been convicted in the Superior Court of the State of California, in and for the County of Los Angeles, of the crime of grand theft and violation of the Corporate Securities Act, a felony, and that judgment had been pronounced on or about November 7, 1947.

Appellants' motion for severance of trial from that of the alleged coconspirator, Moslander, was granted. Appellants' motion under Penal Code, section 995, was denied and each appellant pleaded not guilty. Appellant, Monte G. Mason, first denied the prior conviction alleged, then subsequently admitted it.

Appellants were tried before a jury which found them guilty as charged in Counts I, V, VII, VIII, IX, XI, XIV, XV, and XVI. As to Counts II and III, appellants were found not guilty. As to Counts IV, VI, X, XII, XIII, and XIX, the jury was unable to arrive at a verdict and the trial judge declared a mistrial as to such counts.

Upon return of the jury's verdicts of guilty on the aforementioned nine counts of the indictment, a motion for a new trial and for arrest of judgment under the provisions of section 1185 of the Penal Code was made.

Appellants' motions for new trial were denied. As to appellant Monte Mason, the court found the prior conviction true and he was sentenced to imprisonment for the term

prescribed by law on the counts of which he was found guilty. As to appellant Jeanne Mason, the court sentenced her to imprisonment in the California Institution for Women for the term prescribed by law.

Each appellant appealed from the judgment of conviction, order denying motion for new trial, and order denying motion in arrest of judgment.

The purported appeal from the order denying the motion in arrest of judgment is dismissed. This is not an appealable order. (*People* v. *Mills,* 148 Cal.App. 2d 392, 409 [306 P.2d 1005]; *People* v. *Tidwell,* 108 Cal.App.2d 60, 62 [238 P.2d 21]; 3 Cal.Jur.2d, § 91, p. 542.)

The trial of this matter lasted some seven weeks, with a resultant reporter's transcript consisting of 12 volumes and containing some 3,251 pages. The briefs consist of 275 pages.

The appellants were not found guilty as to all of the substantive counts on which they were tried, however, some of the testimony pertaining thereto is set forth because of its bearing with reference to the conspiracy count.

A résumé of some of the facts is as follows:

Appellant, Monte Mason, was instrumental in organizing Cane Creek Petroleum, Inc., whose articles of incorporation were filed in Utah on October 29, 1948; Americol Petroleum, Inc., whose articles were filed in Colorado on April 28, 1950; M.G.M. Petroleum, Inc., whose articles were filed in Nevada on May 22, 1952; and Modco, Inc., whose articles were filed in Nevada on March 31, 1954. It was appellant Monte Mason who requested the United States Corporation Company to organize the latter two corporations, with dummy incorporators being used.

Robert M. Hale, a special investigator for the Division of Corporations, State of California, testified that the files of the Division of Corporations disclosed that *no permit to issue or sell stock in the State of California had been issued* to appellants, Americol Petroleum, Inc., M.G.M. Petroleum, Inc., or Modco, Inc.; nor had there been a request for a permit filed on the part of any of these individuals or companies.

For purposes of clarity, the various transactions will be set forth under separate headings as follows:

*A. The October, 1952, Meeting at Appellants' Home:*

A meeting was held at appellants' home in North Hollywood, California, in October, 1952, at which time Monte Mason talked about oil wells and an oil field in the area of Moab, Utah. He produced a fruit jar that contained some

oil and demonstrated how it burned. He told the group of people present[6] that he was experienced in oil matters and that he had drilled many wells. He represented that his companies had a well in Utah which was producing oil at the rate of 9,800 barrels per day and that the oil sold at the well for $4.10 per barrel; that they were realizing about $40,000 a day from the output of this well and that they expected to ''spud in'' a second well within a few days. Mason stated that wells were being drilled on leases obtained by himself and his wife; that they had formed Americol Petroleum, Inc.; that the other corporation involved was M.G.M.; that M.G.M. stood for his initials. He related further that he and his wife had assigned the leases to Americol in consideration of receiving 2,800,000 shares of stock which represented over half the stock of the company, and that they had some stock for sale; that anyone who bought stock in M.G.M. would have an option on Americol stock.

Monte Mason ran a film which showed a producing well, stating that it was an old well which had come in before the war and had been capped. During the course of the meeting Slate asked whose stock was being sold. Mason said that it would be from his wife; he said further that he had no stock in his own name because of the possibility of lawsuits in drilling operations. Slate asked the mechanics of purchase, and Mason said, *''Well, we can't do it the easy way, I have got to get around the Corporate Securities Act.''* (Emphasis added.) Mason said that another individual had put some money in and that they had taken him to Las Vegas, Nevada. He suggested the appointment of an agent in Las Vegas to whom the stock could be transferred. He referred to a Rulin Earlin as an attorney representing him in Las Vegas. He said too that he had turned down more than $60,000 in the past few days because he did not like the looks of the people.

During the evening, there were three telephone calls which supposedly were from the well area. Mason could be heard talking from the telephone, saying, ''Great, great, that is tremendous.'' He reported back to the group that progress was wonderful up there and that it looked better all the time. He also said to one of the persons present that if the latter wanted to get in on the deal he would need to have his money in by the following Saturday because things were going very rapidly.

---

[6](a) Houston H. Slate; (b) Dr. Huntley; (c) Mr. Sorensen; and (d) Ralph Hunt.

*B. The Willis E. McKnight Transactions:*

Willis E. McKnight, a resident of Glendora, California, first met Monte Mason on March 11, 1955, having been introduced to him by Wesley Durston at a well site in Moab, Utah. On his arrival at the site, it appeared that the well had just come in (that is, McKnight was so advised by Mason). McKnight assumed it had come in from seeing a quantity of oil on the ground around the derrick and on the platform. McKnight, Durston, and Mason talked about the gravity of the oil, the approximate quantity, and the number of barrels per day the well would produce. Mason stated that the well had good possibilities from a test that had been made and that it looked as if it ought to go at four or five hundred barrels a day or more. Mason stated that the well belonged to Modco, that it was being drilled by himself and that he was the operator.

Prior to this occasion, McKnight had discussed the operations and oil wells with Durston. He had loaned Durston $2,000. After his meeting with Monte Mason, McKnight asked Mason if the loan which he had made to Durston could be used to buy stock in Modco, and Mason replied that it could.

In April, 1955, during a conversation between McKnight and Mason, Mason inquired as to whether McKnight had any friends who desired to buy stock in the company; that funds were needed to get the operation going because of some trouble. Mason stated that the stock to be sold would be treasury stock and that he needed the money for the payroll and for the various subcontractors.

At Mason's request, McKnight invited several people to his home in April. McKnight recalled two such meetings at his house, and particularly the occasion of April 19th. At that meeting, Mason told the persons present about the old M.G.M. well, stating that water had entered the well and congealed the oil; that they had talked with the Dow Chemical Company in an effort to work out a solution; and that the new Modco well was producing about 40 gravity oil which was very good. Mason then ran a film showing the area in question. He said they were selling stock because they needed more funds; that they had to purchase casing and meet payrolls; that they were having trouble losing tools with respect to the Modco well. Mason also stated that Modco stock could be bought but that one also had to buy shares in Americol and M.G.M.

At Mason's request, McKnight agreed to act as trustee for

his (McKnight's) friends. When Mason was asked whose stock it was which was up for sale he said there were plenty of shares left in each corporation and that they also had an option on several thousand shares which were going to be donated back to the company if they were sold.

After one of the meetings at his home, in April, McKnight telegraphed $6,500 to Modco, Inc., at Moab, Utah, at Mason's instructions in connection with the purchase of some stock.[7]

McKnight made three checks payable to the order of Modco, including People's Exhibit 41, which was a check for $2,000 dated May 4, 1955, made so payable on Mason's instructions. In delivering the checks to Mason, McKnight stipulated that they would be for corporate uses. McKnight indicated that he did not want stock for all of the checks; he wanted the money back. He did get stock for part of the money.[8] The stock certificates were mailed or delivered to him.

McKnight received money from a number of different people for the purpose of purchasing stock in the corporations.[9] This money was sent at Mason's direction by Western Union or mailed to Modco at Moab, Utah, or to Glenn and Parent, Trustee, Grand Junction, Colorado.

On or about June 11, 1955, McKnight again saw Mason. The latter indicated that he needed some additional money for withholding taxes against Modco.[10] On this occasion, McKnight gave Mason a check for $5,000 as a loan. Mason had requested either a loan or the purchase of more stock. The money was loaned on the assurance it would be repaid within ten days. McKnight recalled that a Mr. Hudson and possibly a Mr. Cunningham accompanied Mason on this occasion. McKnight was solicited at his office.

McKnight recalled an occasion at Moab, Utah, when Mason was present and he met a Darrell Reardon. He understood

---

[7]*Source of money*: Edwin and Norma Mayer; John B. and Carra Marlin; Charles and Ethel M. Shemely; and Willis or Dorothy G. McKnight.

[8]12,000 shares of Modco; 680 shares of Modco; 7,500 shares of Modco (People's Exhibits 42, 43, and 44).

[9]Edgar H. and Audrey M. Mueller; Erwin E. and/or June M. Yoder, Jr.; Erwin and Cuba Yoder, Sr.; Walter and/or Irmgard K. Schilling; John B. and Carra Marlin; Willis E. and Dorothy G. McKnight; Clarence I. and Gladys Tubbs; Frank and Ruby Teter; and William and Ethel H. Kirkland.

[10]No payment on account of withholding taxes re: account of Modco, Inc. was reflected in files of the Internal Revenue Service for the area, nor was the filing of any withholding tax return reflected therein for the months of June, July, August, and September, 1955.

Reardon was an employee of the corporations. He also met a Clyde Moslander at Grand Junction, Colorado, in the office of Glenn and Parent. Appellant Jeanne Mason was also present on this occasion. McKnight observed Monte Mason sign stock certificates for the corporations. He recognized the signatures of M. G. Mason on stock certificates[11] as being those of appellant Monte Mason. Moslander may have signed some certificates.

On one occasion McKnight was introduced by Mason to a James Cunningham. Mason said that Cunningham. was his business manager and further stated that any information that McKnight desired, including matters concerning Modco or M.G.M. could be obtained from Cunningham.

### C. The Frank E. Teter Transaction:

About April, 1955, Teter, a rancher, was invited to the home of his neighbor, McKnight, in Glendora, California. There he met Mason and was shown some moving pictures of an oil project in the area of Moab, Utah, by Mason. During the picture showing Mason explained that the oil was emulsified and that money was needed to seal off the well and pay the help. Mason further stated that the property was on the Modco lease that they had optional ·stock to sell; that for each share of Modco stock one had to buy so many shares of Americol and of M.G.M. in $5,000 blocks.

Subsequently, Teter discussed the purchase with some of the other persons present. He made out a check dated April 20, 1955, for $2,500 to the order of one William Kirkland. He and Kirkland were taking a block of $5,000 and McKnight was to act as trustee to hold the stock. Later, Teter received some shares of stock through the mail.[12]

### D. The William Kirkland Transaction:

William Kirkland, a contractor, had known Teter for many years and had a conversation with him some time in April, 1955, concerning the purchase of stock in M.G.M., Americol, and Modco. He received a check from Teter and also gave a check of his own to McKnight. Subsequently, he received stock certificates from McKnight.[13] This all occurred in Los Angeles County.

---

[11]See footnote No. 8, *supra*.

[12]600 shares in M.G.M. and 1,200 shares in Americol (People's Exhibits 6 and 7).

[13]600 shares in M.G.M. and 1,200 shares in Americol (People's Exhibits 8 and 9).

*E. The Edwin A. Mayer Transaction:*

Mayer, a contractor, also attended a meeting at McKnight's home in April, 1955. He also observed the moving pictures and heard Mason's explanations. Mason stated that money was needed to clean up the well and get operations going again and also to pay social security and unemployment taxes which were in arrears. Mason referred to Modco, M.G.M., and Americol Companies. He stated that the oil was the best oil ever produced this side of Pennsylvania; that when the first well came in and the money resulting therefrom would be available, they would use part of it to bring in another well, part would go to some of the other companies, and the balance would go to the investors.

Mason further stated that it was necessary to buy stock in $5,000 blocks but that if one did not want to buy that much one could purchase half of it with McKnight acting as trustee for the stock. Thereafter, Mayer gave McKnight a check for $2,686 dated April 20, 1955, and subsequently received in the mail his certificates for the shares of stock.[14]

*F. The John Marlin Transaction:*

John Marlin, a contractor, met appellant Monte Mason at McKnight's house in March, 1955. Mason ran some film for the group there. He explained an area on a map indicated for Modco. He stated that oil had been overflowing from the tanks; that some oil had been hauled to Salt Lake City; that the first well had been drilled in 1921 but had to be capped because it overflowed into the river; that they had to clean out the present well; that it was necessary to bring in an outfit from New Mexico to cement the bottom of it, and that they had to issue some more stock because they needed more money to cement the well. Mason further explained that they were selling stock in Modco and he indicated a connection with M.G.M. and Americol which had adjacent leases. Mason stated that his wife (appellant Jeanne R. Mason) had the lease on the property in question.

Marlin said that he had previously bought stock in Americol and M.G.M. and he was therefore interested in purchasing Modco stock. Mason stated in effect that it was possible to purchase Modco shares in proportion to shares previously purchased in M.G.M. and Americol; that at least 5,000 shares

---

[14] 1,360 shares in Americol and 680 shares of M.G.M. (People's Exhibits 11 and 12).

of Modco should be purchased and that the stock would be held in trust by McKnight.

At Mason's direction, Marlin made a check dated March 25, 1955, in the sum of $1,003 payable to the order of the Robert Parent Company; he made another check in the amount of $340 payable to the same order. Mason stated that the Robert Parent Company was handling the issuance of the stock. Marlin also wrote another check for $1,343 dated April 20, 1955, with which, together with the other two aforementioned checks, he purchased stock in Modco, Americol, and M.G.M.

At various times Marlin received stock certificates. (340 shares of M.G.M., and 680 shares of Americol had been delivered to him by McKnight prior to the time Marlin met Mason.) The other certificates were received by Marlin through the mail from the Glenn Parent Company.[15]

### G. The E. E. Yoder, Jr., Transactions:

Yoder, Jr., a contractor, attended a meeting on April 19th or 20th, 1955, at McKnight's residence where he saw appellant Monte Mason. Yoder was accompanied by a business partner, Edgar Mueller, among others. At the meeting, Mason spoke and narrated a film. Mason told of bringing in a well that gushed some 300 to 400 feet over the derrick. He said that there was some trouble with magnesium chloride water getting into the oil; that the oil was of a high paraffin base and that money was needed to continue operations, to meet current obligations, and to clean out the well and finish the casing. In stating that money was needed for corporate obligations, Mason referred especially to Modco.

Mason said that he would sell some of his personal stock to raise the money; that there were three companies in which he was the principal stockholder; that Modco had a producing well; that in order to purchase stock in Modco, it was necessary to also buy stock in Americol and M.G.M., the other companies; that Modco stock could be purchased in blocks of 15,000 or more, and inasmuch as the persons present were not anticipating purchasing that quantity, Mason would put the stock in trust for them. At Mason's suggestion, it was agreed that McKnight would act as the trustee.

Mason also said that they should make out cashier's checks payable to Glenn L. Parent Company which would issue the stock to them; that such company was the auditor for the

---

[15] 1,360 shares of Americol and 680 shares of M.G.M. (People's Exhibits 16, 17 and 19).

corporations. Thereafter, Yoder decided to purchase stock. He purchased a cashier's check with a personal check in the sum of $3,950 dated April 21, 1955. The cashier's check was made payable to Robert L. Parent, Trustee. Yoder gave the check to McKnight. Shortly thereafter, Yoder received various stock certificates.[16]

In June, 1955, Mason came to Yoder's office in Downey, California, at which time Yoder's business partner, Edgar Mueller, was present. Mason said that they had been shipping some Modco oil to Salt Lake City; that the well had been swabbed out, but that the swab had been lost and he had sent to New Mexico for a fishing tool to recover the swab; that he had put a charge loaded with shot down in the bottom of the casing to perforate the casing; that additional funds were needed for this operation and that he was willing to sell some of his stock. Mason explained that he would sell it on the same ratio as before (*i.e.*, so many shares of Americol, of M.G.M., and of Modco). Yoder indicated a preference for more of Modco and less of the other two and Mason agreed. Mason was in a hurry, stating that he had to fly back that night and needed the money immediately; that he would take Yoder's and Mueller's check made out to Robert L. Parent as trustee. Mason also stated that the firm of Glenn and Parent would issue the stock. Yoder gave a check to Mason dated June 1, 1955, for $2,657. Thereafter, in the mail, Yoder received a certificate for 400 shares of M.G.M. stock.

*H. The Edgar Mueller Transactions:*

Mueller, a contractor, first met appellant Monte Mason on April 19, 1955, at McKnight's home in Glendora. Mueller had gone there by invitation with his business associate, Yoder.

A film was run and Mason explained the setup and stock structure as before. There were a number of questions between the persons present at the meeting. Mason stated that he would sell some stock and that it was his own stock. He said that the Modco stock was the most attractive but that he would not sell it unless the parties purchased proportionate shares of stock in the other two companies. It was agreed that the checks for the stock would be given to McKnight who would send them in with his own.

In accordance with Mason's instructions, Mueller purchased a cashier's check in the sum of $3,950.25 made payable to Robert L. Parent, Trustee. This check was transmitted to

---

[16]1,000 shares of M.G.M. and 2,377 shares of Americol (People's Exhibits 24, 25 and 26).

McKnight. The record discloses that it was endorsed by Robert L. Parent, Trustee, and C. D. Moslander, Jr., the latter having signed many of the stock certificates as assistant secretary. Subsequently, Mueller received by mail various certificates of stock.[17]

Some time after the meeting at McKnight's house, Mueller saw Mason at his (Mueller's) office in Downey, California. Yoder was present. Mason explained that they were having some difficulties and needed a few more thousand dollars to put the well in production. Mueller had his wife make out a check for $2,657. It was also made payable to Robert L. Parent at Mason's direction. Mason stated that he would not have time to wait for a cashier's check inasmuch as he had to catch a plane that evening to go back to the well. Mason stated that Robert L. Parent was an accounting firm in Grand Junction, Colorado.

Subsequently, Mueller received a stock certificate in the mail.[18] Later, Mueller spoke with Mason by telephone and inquired as to whether Mason could legally sell his stock; Mason replied that he could.

*I. The Clarence Tubbs Transaction:*

Some time shortly before March 22, 1955, Tubbs, a contractor, went to McKnight's house at the request of the latter where he met appellant Monte Mason. Mason showed a short film, stating that they had a well which they thought was a producer and that money was needed to finish it. Mason explained that he could raise the money by selling stocks in M.G.M., Americol, and Modco in a certain ratio. He also said that they had borrowed equipment from Modco to put the well in and they only had so many days to use the material.

On or about March 22, 1955, Tubbs flew to Moab, Utah, with McKnight and Mr. Wood. Durston met them at the airport. They all went to the well site with Monte Mason. At the well site they had a discussion with Mason and he referred back to the film. He showed where oil had supposedly been flowing and indicated that certain material had been mixing with and impeding the flow, stating that money was needed to drill through and rectify the condition. Mason explained the ratio in which they would have to purchase stock.

Thereafter, Tubbs did purchase some stock. He made a check dated March 25 to the Robert Parent Company for

[17]1,000 shares of M.G.M.; 2,370 shares of Americol; (People's Exhibits 31, 32 and 33).
[18]400 shares of M.G.M. (People's Exhibit 35).

$1,003. This check was drawn pursuant to McKnight's instructions and was transmitted to McKnight for the purpose of buying stock in M.G.M., and Americol. Subsequently, Tubbs received the certificates.[19]

On a later occasion, Tubbs purchased a cashier's check made payable to the order of Robert L. Parent, Trustee, dated April 21, 1955, for $340, and gave it to McKnight for the purpose of purchasing Modco stock.

*J. The Charles Shemely Transaction:*

Shemely, a subdivider, attended a meeting at McKnight's house about April 19, 1955. Appellant Mason showed a motion picture which depicted a flowing well and some tanks. He told about the approximate flow of the oil, and how they had to haul the oil to Salt Lake City; the difficulty with the well because of the foreign matter coming into it; how they needed money to meet payrolls and to clean out the well and that this was the reason that stock was being sold. Mason said that Shemely could purchase stock in two of the different companies, one of them being M.G.M., as Shemely recalled. He said that Shemely would have to buy $5,000 worth to participate in a third company, Modco. Also, Mason stated that Shemely could not buy stock in Modco in his own name, but only through McKnight as trustee.

Shemely wrote a check dated April 20, 1955, in the sum of $680 to the order of McKnight and gave it to the latter. He never received any certificate in Modco.

At some time prior to the aforementioned meeting, Shemely had spoken with McKnight about the purchasing of stock in the various corporations. He had given a check dated March 23, 1955, in the sum of $2,000 to McKnight. Shemely then received certificates from McKnight.[20]

*K. The Angus C. McBain Transactions:*

McBain, an attorney in Los Angeles, was acquainted with appellants. On or about September, 1954, he went to appellants' home in Studio City, California, at the invitation of R. A. Meader, Prescott Metcalf, and James P. Cunningham, all of whom were present at appellants' home. Appellant Jeanne Mason was in and out of the room. Upon one occasion at this meeting, Monte Mason said that his wife was the owner of sufficient stock to have control of Americol

[19]680 shares of Americol, and 340 shares of M.G.M. (People's Exhibits 37 and 38).

[20]680 shares of M.G.M., and 1,360 shares of Americol (People's Exhibits 94 and 95).

Petroleum, Inc., and M.G.M. Petroleum, Inc., and that these corporations held leases on government property on the Colorado River near Moab, Utah. Appellant Monte Mason related that around 1925 or 1926 some wildcat outfit had drilled into oil on what had been the Americol Petroleum property; that there had been a gusher but that it was uncontrollable and at that time an old-fashioned cable outfit was the means used to dig the well. Mason further stated that he had acquired some of the leases; that he had drilled on the property and had brought a considerable amount of oil to the surface but an emulsification problem had developed. He mentioned another well where oil had been found, but which had to be plugged because of inadequate equipment. Mason said that he had some difficulty with one group of stockholders; that there were between two and three million shares issued in each of these corporations, and that his wife owned the stock and that she was willing to sell some at which he felt was a fair price or sacrifice. He then showed some pictures of the wells and the property. Mason stated that the reason the stock was being sold was that money was needed to put the wells on production. Meader and Metcalf stated that they had been to the property and had seen evidence of oil. McBain informed Mason that he was interested, and that he had a friend whom he would like to bring to the house. Mason invited McBain to return.

McBain next saw appellant Monte Mason about a week later at the latter's house. Jeanne Mason may have been present. Also present were a Dr. Grunigan and another doctor. Monte Mason gave the group a brief description of the property, stating that they had been whipstocking and doing other work, and were short of funds. He explained that his wife proposed to sell some of her stock and that the money would be used for producing the wells. He mentioned that he had an independent source of income from some Louisiana interests and that no officer of the corporation would draw any money. One of the group present said that they would consider the matter and be in touch with Mason later.

About a week after the above meeting, there was another meeting with Mason at the latter's home. Jeanne Mason may have been present. McBain was accompanied by Charles Scharf. Scharf was a businessman who had speculated in oil before. Mason repeated the history of the field.

Subsequently, that same month, McBain and Dr. Grunigan again saw Mason at the latter's home. The doctor referred to

a telephone conversation with Mason in which the doctor said that they did not want to go into the venture but that Mason had an idea which would take the risk out of it. The doctor asked Mason to explain his idea. Mason said that they had to raise money; that his (Mason's) home was worth between sixty and seventy thousand dollars; that there was only a trust deed against it of $12,000; that he would give a second trust deed on his home for whatever amount they cared to raise and he would pay interest on it; and as an inducement he would give them shares of stock in Americol or M.G.M.

Since there was more than one investor in this particular group, Mason suggested that the shares of stock issued on the trust deed should be put in the name of one person so that when they were producing oil the corporations could be dissolved and per cents issued, and that 27½ per cent depletion allowance for tax purposes could be carried home to the individual investors. It was suggested that the shares be placed in McBain's name, and arrangements were made for a trust deed on the Mason property.

After a meeting at the escrow company where the transaction was consummated, McBain and Dr. Grunigan flew to Moab, in November, and saw appellant Monte Mason there. Subsequently, some time in December, another meeting took place at the Mason home at which appellants, Dr. Grunigan, James Cunningham, and McBain were present. Mason said that the expense of whipstocking was killing them financially and that they had run out of funds; that he (Mason) had arranged with M.G.M. to farm out 80 acres of their lease to a corporation which had just been organized by the name of Modco, Inc.; that the purpose of the farming out was to attract more capital; that the corporation was issuing six or seven hundred thousand shares of stock to Jeanne Mason; that the stock was issued to Mrs. Mason with the understanding that she would use it to raise the money necessary to drill a well on the Modco property. Mason explained the price of the stock and the amount of money needed for drilling. McBain told Mason that they were not interested in a direct stock investment. Mason replied, "Well, suppose I secure this one, also, and I will give you some stock as an inducement." Then he said he would give them a chattel mortgage on the oil field equipment in Utah, which was in his wife's name; also that he would give them a note for carrying, bearing six or eight per cent interest and added: "If you fellows put up $15,000 of this, I will give you 20,000 shares of Modco stock." Cunningham produced an

inventory of equipment in the field, and Mason indicated that it was clear, stating that the proposed security was worth several times $15,000. As a further inducement to the making of the loan, Mason said that he would give them an option exercisable 10 or 15 days after the Modco well had been placed on production to purchase 15,000 shares of Modco stock at a dollar a share and if they exercised the option, all they would have to do would be to give the satisfaction on the note and chattel mortgage. Mason further stated that he had to get the money immediately and to guarantee that they had proper title on the chattels he would pledge to them 400,000 shares of Mrs. Mason's stock in Modco. Mrs. Mason may have been present at that particular time. McBain said that the deal would be considered. Several days later, McBain called Mason and told him that on his certification that the equipment was clear, they would put up $15,000 on a chattel mortgage.

McBain had a meeting between Christmas and New Years, 1955, at his house with appellant Monte Mason and Cunningham on which occasion Mason said that he had to go over to the property in Utah and that Cunningham would take care of the details in receiving the $15,000 and would deliver the chattel mortgage and promissory note. At this time, also, Mason said that he was hard pressed for money. McBain stated that he would advance Mason a thousand dollars on account of the $15,000, and he gave him a check for that amount.

On January 4, 1955, Cunningham came to McBain's office in Los Angeles at which time Cunningham produced a chattel mortgage dated January 3, 1955. The name Jeanne R. Mason already appeared on it. McBain told Cunningham that he (McBain) could not release any funds until a promissory note was signed by Mrs. Mason. At Cunningham's request, McBain prepared a note and Cunningham left the office stating that he would get Mrs. Mason's signature. He returned the same day with the signed note. He also gave McBain a letter of agreement. The record discloses that it bore the signature of Jeanne R. Mason, with J. P. Cunningham as a witness, and that it referred to 20,000 shares of Modco stock as being part of the consideration for the loan; that 400,000 shares of Modco stock was being given as security to guarantee that the property covered by the chattel mortgage was clear; and provided the right to exercise the option of purchasing 15,000 shares of Modco for a period of 15 days after notice that the well was on production. Cunningham related that he had with him some checks which he had picked up in connection with the trans-

action. McBain gave Cunningham some additional checks. A total of $15,000 was turned over to Cunningham in the form of checks, including the check for $1,000 which McBain had previously given Monte Mason. Cunningham indicated that Glenn and Parent of Grand Junction, Colorado, the transfer agents, would mail the stock certificate for 20,000 shares of Modco to McBain as trustee. Subsequently, the same month, the aforementioned stock certificate was received.

Thereafter, up until March, 1955, McBain had several conversations with Cunningham about drilling the well and what had been taking place in Utah. On one occasion, Cunningham told him that they soon expected to be entering the production zone.

On March 5, 1955, Cunningham came to McBain's home and presented a document of that date on the letterhead of J. P. Cunningham, Business Management, which stated that the well was on production. This document referred to the option portion of the letter of agreement and it bore the signature of J. P. Cunningham for Jeanne R. Mason.

At Cunningham's suggestion, he, McBain and Mr. Scharf flew to Moab, Utah, where they met appellant Monte Mason at the office of M.G.M., Americol, and Modco. A Mr. Gray and some other people were present. Someone stated that the well was really "blowing." They then proceeded to the site, where they met a John Heatherington, the superintendent. Mason told Heatherington to turn on the well. Oil began to come out of the well. They then proceeded to a storage tank and observed oil gushing through the pipe which looped over the top of the tank.

On returning from the site to the office in Moab, they had some further conversation with Mason. He said that now that this well was in production he thought they should proceed rapidly and start drilling; that he had options on M.G.M. and Americol stock which he was willing to sell in "units" consisting of one share of M.G.M. and one of Americol for not more than $2.10 per unit on condition they would give him an option to buy back every sixth share. Mason stated he did not want to sell the stock, but needed funds. Mason also discussed with McBain whether the latter would exercise the aforementioned option of cancelling the $15,000 chattel mortgage, and McBain said that he would take it up with the persons interested upon his return to Los Angeles.

Upon his return to Los Angeles, McBain had a conversation with Cunningham, then he (McBain) executed a form of satis-

faction of chattel mortgage to release the indebtedness of $15,000. According to McBain's testimony, the reason he executed the form of satisfaction to release the indebtedness was "in reliance on a statement made to me that the well was on production." McBain either mailed the satisfaction to Mason's house or transmitted it to Cunningham.

In exchange for exercising the option and eliminating the debt, McBain received a certificate for 15,000 shares of stock of Modco, Inc. He received it in his office some time in March, 1955, either through the mail or from Cunningham personally.

On March 8, 1955, McBain purchased two cashier's checks, each in the sum of $19,475, payable to Glenn and Parent. On the same day, a third check (personal check) in the amount of $27,300, along with the two cashier's checks, was turned over to Cunningham in order to purchase "units" of stock of Americol and M.G.M. in accordance with Mason's offer earlier that week in Moab. Subsequently, McBain, as trustee, received certain certificates.[21]

With respect to the $15,000 loan which McBain cancelled when he exercised the option, he never got back any part of the sum originally loaned.

As to whether or not there was ever a Modco well in production, the reporter's transcript discloses:

"Q. Now, you were asked on cross examination, sir, by Mr. Strong, whether you had learned whether anything that Mr. Mason had said was untrue. You answered 'No.' Let me ask you, Mr. McBain, did you ever learn as a matter of fact whether or not there was a Modco well ever in production?

". . . . . . . . . . . . . .

"THE WITNESS: Yes. It was my information there wasn't . . ."

*L. The Robert O. Pearman Transaction:*

Dr. Pearman was residing at San Luis Obispo, California. He met Mason at his (Pearman's) office early in February, 1955. Cunningham was also present and he, along with Mason, represented that the former was Mason's secretary and more or less in control of the financial end of the venture which Mason was proposing. Mason stated that he had a lease on some property near Moab, Utah; that some years before an oil well had been drilled there; that the oil had flowed into the Colorado River; that the farmers had objected and that the

[21]32,390 shares of Americol and 32,390 shares of M.G.M. (People's Exhibits 66, 67, 68 and 69).

well had been cemented; that subsequently he secured a lease from the Cane Creek Company and had drilled another well. He showed motion pictures of the well and oil coming out of the ground and running into a trough. He said that he needed more money to bring the well in; that if Dr. Pearman would invest some money he would receive a tax advantage because his checks would come from the refinery; that he (Mason) could obtain capital in the East, but that he desired to maintain control of the property within a small group and that there was some stock which Dr. Pearman would receive as representing his share of the venture. Dr. Pearman gave a $5,000 check made payable to Cunningham at Mason's direction in that Cunningham was Mason's representative. Subsequently, Dr. Pearman received some shares of Modco stock.

In early March, 1955, Dr. Pearman met appellant Monte Mason and Cunningham at a hotel located in Los Angeles. They had a discussion about the well and the stock. Mason said that if Dr. Pearman was interested he could buy some additional shares in the venture, the stock now being in Americol and M.G.M. in a certain ratio. After further discussion, Dr. Pearman sent a check for approximately $2,970 to Glenn and Parent in Grand Junction, Colorado, as directed. Presently, he received, through the mail, a certificate for 1,000 shares of M.G.M. and a certificate for 2,000 shares of Americol.

*M. The Meeting at the McKenna Residence:*

On the afternoon of May 9, 1956, Monte Mason came to the residence of McKenna in Santa Monica, California. Prior to Mason's arrival, other persons arrived, including Mr. Hodge of the Better Business Bureau and Mr. Brownson of the district attorney's office. Brownson installed some concealed microphones in the house, along with a tape recording apparatus. McKenna had given his consent, but all of this was unknown to Mason. Hodge was introduced to Mason as a friend of McKenna, who might be interested in Mason's venture. Mason, who had previously discussed an oil venture with McKenna, showed a film relative to a well in the Moab area which was flowing oil, and a conversation ensued within the range of the hidden microphones. The recording apparatus was operated by Brownson.

The tape recording which was played to the jury reflected, among other things, that Mason stated that Moab was booming; told of the area near the Colorado River; told of a well having been drilled in 1925; that said well had flowed considerably;

that the oil was of better grade than that produced in Pennsylvania, Ohio, et cetera; that the property was in litigation. While showing the films, Mason discussed the history of the field and related that he started certain operations in 1950 when he paid Cane Creek for an option. He described the difficulty caused by the magnesium chloride water getting into a well and how the well had to be cemented. He then described other operations. He said the well which his group operated had flowed 9,856 barrels of oil through a ten sixty-fourth choke hole, and 3,226,000 cubic feet of gas; that the well had to be "killed" because there was no way to get casing into the ground, and that the well had produced 30,000 barrels of oil a day. He described the trouble they were having with a subsequent well sanding up, stating that the well flowed hard but that it needed to be cleaned out, and that they were using the Halliburton Company testing services. He indicated that the Modco well, on which they were not concentrating, was none the less flowing commercial oil, stating at one time, "This is a good commercial well at this minute," and at another that he "could definitely say that it is on commercial production right now."

Further, Mason described the companies that he and his wife controlled, saying that they all were domesticated to do business in Utah. In this connection he told of Modco, Americol, and M.G.M., and also mentioned Standard Consolidated, indicating that he was offering shares in these companies. He pointed out their holdings on a map. He referred to the terms of government leases, and referred to Cane Creek Oil Company as the original lease, with his wife as the operator, and with the operating agreement covering various leases. He said that the leases were in his wife's name and that assignments were made to the different corporations; that he was offering the persons present stock in the corporations; that he was offering a "package deal" as to the purchase of stock in the companies.

*N. Records of the Department of the Interior:*

I. Records of the Land Office, Utah.

Ernest L. House, Manager of the United States Land Office for the State of Utah, Department of the Interior, had access to the gas leasing records for that state. He ascertained that prior to June, 1956, with respect to the leases known as Salt Lake 064948, 064040, 064950, and Utah 0496, there was no record of any interest therein in the name of either of the appellants, M.G.M. Petroleum, Inc., Modco, Inc., Americol Petroleum, Inc., or Standard Consolidated Petroleum, Inc. No

interest in oil or gas leases, nor any operating agreements on the part of Modco, were reflected in the records.

House identified People's Exhibits 101 and 102, indicating respectively, lease Number 064948 dated January 1, 1948, issued to one John L. Shafer from the United States Government, and an assignment thereof dated October 19, 1951 to the Cane Creek Oil Company. He identified People's Exhibit 103, indicating lease Number Utah 0496 dated January 1, 1950, issued to one Frank Shafer from the United States Government. People's Exhibit 104 reflected an assignment of the last mentioned lease to the Cane Creek Oil Company dated October 19, 1951. People's Exhibit 105 reflected an operating agreement between Jeanne R. Mason, as operator, and Cane Creek Oil Company, as nonoperator, dated October 31, 1951. People's Exhibit 106 reflected an operating agreement similar to that denoted in People's Exhibit 105. People's Exhibit 107 reflected an assignment of an operating agreement from Jeanne R. Mason to Americol Petroleum dated November 19, 1951. People's Exhibit 108 reflected an assignment of an operating agreement from Jeanne R. Mason to Americol Petroleum dated October 31, 1951. People's Exhibit 109 reflected an assignment of an operating agreement from Jeanne R. Mason to M.G.M. Petroleum dated September 23, 1952. People's Exhibit 110 reflected a partial assignment of an operating agreement from Jeanne R. Mason to Modco, Inc., dated November 18, 1954. This latter attempted assignment was not received in House's office until January 11, 1955, and was denied approval as reflected in a decision denoted People's Exhibit 111 dated August 4, 1955.

The land described in the assignments denoted Exhibits 108 through 110 was embraced in the leases denoted Exhibits 101 and 103. The land constituted portions of the entire land described in Exhibits 102 and 103. The land described in Exhibit 107 was likewise all included within the leases, as was the land described in Exhibits 105 and 106.

II. Records of the Geological Survey Branch.

Harold C. Scoville, a petroleum engineer attached to the United States Geological Survey Branch of the Department of the Interior, had access to certain documents. His office maintained records on all wells drilled under federal leases in the State of Utah. Royalties on produced oil with respect to government leases, were paid to the United States through Scoville's office.

Scoville testified that he had searched the records to ascertain if any royalty had been paid on any oil produced on a federal lease by an operator known as Monte G. Mason, and he found that no royalties were paid in the Cane Creek Field on any leases; that he had checked the leases and they were Utah 0496, Salt Lake City 064948, Salt Lake City 064949, Salt Lake City 064950 and Salt Lake City 026375. The witness further testified that *their records did not show any producing well was ever completed on any of the described leases in the Cane Creek Field.*

### O. Aspects of the Leases and Operating Agreements:

The record indicates that the leases denoted People's Exhibits 101 and 103 required in effect that the lessees do certain work, pay certain royalties, and pay a nominal yearly rental per acre (*i.e.,* between 50 cents and a dollar); that there was a recital in the operating agreement denoted People's Exhibit Number 105 (which together with Exhibit 106 related to land described in Exhibits 101 and 103) to the effect that no cash consideration was paid by appellant Jeanne Mason for the agreement, but rather that the obligation to perform the drilling requirements and pay the rentals constituted the consideration; and that the same applied as to the operating agreement denoted People's Exhibit 106. There was defense testimony that as to one of the assignments of operating agreement Jeanne Mason received 2,800,000 shares of stock valued at one dollar per share by M.G.M. The record further discloses that People's Exhibit 110 included a partial reassignment by M.G.M. to appellant Jeanne Mason of drilling rights originally assigned to this company, reciting a consideration of $10.

There was also defense testimony reflecting that the transfers of shares of stock received by the various prosecution witnesses were charged against shares of Jeanne Mason's stock; and that the consideration she had given for the stock certificates which were issued to her in the different companies was "the oil leases on the property" (*i.e.,* assignments of operating agreements for which agreements, no cash consideration was paid). The record also indicates that a number of the certificates bore no dates for her endorsements.

### P. Bank Records:

Harry T. Steffens, Assistant Vice-President of the United States Bank of Grand Junction, Colorado, had with him documents pertaining to the Robert L. Parent, Trustee accounts at his bank. He identified People's Exhibits 63 and 64

(*i.e.,* involved in the McBain transactions) as being checks which had been cashed at his bank. People's Exhibit 65 (also so involved) was another check which had cleared through his bank and had been deposited. People's Exhibit Number 72 constituted a record of the Robert L. Parent, Trustee account from the period January 3, 1955 through November 21, 1955. Another exhibit reflected signature cards for that account. People's Exhibit Number 74 constituted a deposit slip for the check denoted People's Exhibit 65 (in the amount of $27,300, drawn by McBain and dated March 8, 1955) said check having been deposited March 11, 1955. It was indicated that People's Exhibits 63 and 64 were cashed on March 10.

People's Exhibit 75 constituted a money order drawn on Steffens' bank which was deposited in the First National Bank of Grand Junction, Colorado. It was made to Glenn and Parent, C. D. Moslander, Trustee. Steffens identified a group of other money orders issued by his bank, these being People's Exhibits 76 through 88. He noted that one of them was endorsed for deposit only to the account of Modco, Inc. People's Exhibits 81 through 88 comprised money orders issued by his bank, made to a certain payee and negotiated for payment generally through the First National Bank of Moab, Utah. People's Exhibits 89 through 91 comprised deposit slips showing deposits made at Steffens' bank.

It was stipulated that the money orders denoted People's Exhibits 76 through 78; 80 through 84; and 87, bore the signature of Monte Mason, that is, M. G. Mason, on the reverse side of each one.

A handwriting expert who had made a comparison of the signature of C. D. Moslander, Jr. on People's Exhibit Number 73 (signature card) was of the opinion that it was signed by the same person who wrote that name as an endorsement on the reverse side of People's Exhibit 75 (money order). In the expert's opinion, the name Robert L. Parent, written on People's Exhibit 73, was written by the same person who wrote the same name as an endorsement on the reverse side of People's Exhibit 75.

The record discloses that a considerable amount of money from the Parent Trustee account (some of it about the time stock certificates were purchased, and particularly about the time the checks denoted People's Exhibits 63 through 65 were received), was endorsed over to Modco, Inc., through the use of the money orders, in some instances Jeanne Mason's en-

dorsement or that of appellant Monte Mason appearing thereon.

*Q. Evidence as to Handwriting:*

It was stipulated that Monte Mason's signature appeared on the following documents: People's Exhibits 6 and 7 (stock certificates for Mr. Teter); People's Exhibits 8 and 9 (stock certificates for Mr. Kirkland); People's Exhibits 11 and 12 (stock certificates for Mr. Mayer); People's Exhibits 16 through 21 (stock certificates for Mr. Marlin); People's Exhibits 24 through 26, and 28 (stock certificates for Mr. Yoder); People's Exhibits 31 through 33, and 35 (stock certificates for Mr. Mueller); People's Exhibits 37 and 38 (stock certificates for Mr. Tubbs); People's Exhibits 42 through 44 (stock certificates for Mr. McKnight); People's Exhibit 46 (a check from Mr. McKnight); and People's Exhibit 2-A (Minutes of Americol Corporation meeting of board of directors).

A handwriting expert compared exemplars of the appellants' writing with writing appearing on a number of documents. It was his opinion that Jeanne Mason's signature appeared on the following documents: People's Exhibit 110 (assignment of operating agreement from appellant Jeanne Mason to Modco, Inc.); People's Exhibit 109 (assignment of operating agreement from Jeanne Mason to M.G.M.); and on People's Exhibit 108 (assignment of operating agreement from Jeanne Mason to Americol). Monte Mason's signature also appeared on Exhibits 108 and 109. Jeanne Mason's signature appeared on People's Exhibit 107 (assignment of operating agreement from Jeanne Mason to Americol), and on People's Exhibits 105 and 106 (operating agreements between Jeanne Mason and Cane Creek Oil Company); Monte Mason's signature also appeared on People's Exhibits 107 and 98 and 99 (stock certificates for Dr. Pearman), and on Exhibits 94 and 95 (stock certificates for Mr. Shemely); that Jeanne Mason's signature may have been the one appearing as first endorser on the reverse side of People's Exhibit 88 (a money order issued by the United States Bank of Grand Junction, as were People's Exhibits 76 through 87); that Monte Mason's signature appeared as first endorser on the reverse side of People's Exhibit 86; that his signature appeared as first endorser on the reverse sides of People's Exhibits 81 through 84; and on the reverse side of People's Exhibits 80, and 76 through 78; that his signature appeared on the lower right-hand corners of People's Exhibits 60, 62, and 66 through 69 (stock certifi-

cates for McBain); that Jeanne Mason's signature appeared on People's Exhibits 57 (mortgage of chattels to McBain), 58 (promissory note for McBain), and 59 (letter of agreement as to McBain).

*R. Aspects of the Defense:*

Neither Monte Mason nor Jeanne Mason testified. Duane Randall testified, among other things, that he was a consulting geologist and was familiar with the Cane Creek structure; that he was vice-president of Modco, Inc., and that he was not a paid employee but had an arrangement whereby he would gain stock in Modco, M.G.M. and Americol. He identified various documents pertaining to tests of wells and records of M.G.M.; he testified that the Halliburton Company which made the tests was an independent service company and that the chart indicated excellent formation pressures; that a drill stem test on M.G.M. well No. 2, taken by Halliburton in March, 1955, disclosed that the test tool was open for 73 hours and that oil flowed through it for about 71 hours. He related that he had examined logs of wells within 15 miles of the area and at further distances; that he had compared the showings made on the logs with the showings of M.G.M. No. 2 and found that the logs correlated; and that various limes in the system were extensive.

He related further that he arrived in Moab shortly after Thanksgiving, 1955, and saw the three wells; that oil came out of the Americol well and he bailed some out; that at about the same time he saw oil coming out of the M.G.M. No. 1 well and obtained a sample; that at times it flowed as such as half a cellarfull; that he saw the Modco well and that it was more or less "on production" ever since he was there. By this he meant that one could produce oil from it, that is, that on occasion he had opened the valve and let the well flow itself. He testified to his having found that magnesium chloride water had entered some of the wells and stopped the porosity; that M.G.M. had hired the Dow Chemical Company to solve the problem, and that Dow had added some chemicals to the zone; that this problem faced the Modco well but that it was solved by placing the casing to a depth of 6,600 feet.

Also, he testified that he had examined a number of reports and records and that in his opinion there was a minimum of 4,000 acres of underground porus pay zone on the crest and down the flanks of the Cane Creek Anticline; that the M.G.M., Americol, and Modco wells were approximately in the center

thereof; and that in all probability there were about 200,000,-000 barrels of oil recoverable by primary recovery, although this was a guess.

He acknowledged on cross-examination that no producing well had ever been reported on the leased lands; that none of the wells under consideration had been put on commercial production (*i.e.*, selling day by day over a period of time). He testified that according to his terminology ''production'' meant any oil that came from a formation.

Another defense witness, James Hudson, testified, among other things, that he had been a pilot for the appellants; that about the spring of 1955 he saw McKnight give some checks to Monte Mason and heard him say that he would consider them a loan to the company, and that Mason should do his job up there and pay it back whenever he had the money; that he did not know if the money was ever repaid; and, finally, that he had seen oil flowing from the wells in Utah.

William O. Gray, who among other things was an officer in Americol (*i.e.*, president), M.G.M. (*i.e.*, vice-president), and Modco (secretary and treasurer), related that he had examined numerous exhibits, and he indicated that the transfers of stock received by different prosecution witnesses were charged against shares of Jeanne Mason's stock; also, that the consideration she had given for her stock was ''the oil leases on the property.''

Severin Sorensen testified that he was an officer of M.G.M.; that he had been vice-president and was now secretary; that 2,800,000 shares of M.G.M. had been issued to Jeanne Mason for an operating agreement and that the agreement had been valued by the corporation at $2,800,000.

He related that he met one Houston Slate in a meeting at the residence of Monte Mason approximately in the fall of 1952 when Ralph Hunt and Dr. Ross Huntley were present; that a film was shown by Monte Mason; that Mason had maps of the Moab well site areas and also had some oil; that Mason did not say there were 9,800 barrels of oil coming out of the well each day; that Mason said they had made a test and there were 9,800 barrels per day flowing through a ten sixty-fourth's opening; that Mason said this was the rate of flow; that Mason did not say the oil sold for $4.10 a barrel at the well, but that it would bring about that much at the refinery; that Mason did not say they were realizing $40,000 a day from the output of this well; that Mason did not say they expected to spud in a second well within a few days; that he never heard Mason

say that he had turned down money from anyone because of their looks; that Mason did not say the stock would have to be transferred in Las Vegas because he had to get around the corporate securities act; that Mason did say, however, that the stock would have to be transferred at Las Vegas and that one Rulin Earlin was the transfer agent; and that Jeanne Mason was moving in and out at this meeting.

▇▇▇ Appellants' first contention is that "The indictment fails to set forth acts constituting a public offense with reasonable notice and thus providing opportunity to prepare and present a defense, in violation of procedural due process of law."

The initial attack is directed to Count I of the indictment. Count I is set forth in part in the footnote.[22]

Section 952 of the Penal Code provides:

"In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the

---

[22]"'The said defendants are accused by the Grand Jury . . . of the crime of Criminal Conspiracy to cheat and defraud by criminal means and to obtain money and property by false pretenses and by false promises with fraudulent intent not to perform such promises, in violation of Section 182, Subdivision 4, Penal Code of California, to commit Grand Theft, in violation of Section 487, Subdivision 1, Penal Code of California, and to violate the Corporate Securities Law, in violation of Sections 25009, Subdivision 'a,' and 26104, Subdivision 'a' of the Corporations Code of California, a felony, committed prior to the finding of this indictment and commencing on or about October, 1948, and continuing up to the finding of this indictment, as follows:

"That between said dates and prior to the finding of this indictment, at and in the County of Los Angeles, State of California, and in other counties of California and in the States of Utah, Colorado, Nevada and elsewhere, and within the jurisdiction of this court, the said defendant, [sic], Monte G. Mason, Jeanne R. Mason and Clyde D. Moslander, Jr., together with one Robert S. Ross, Robert L. Parent, Bobb B. Glenn, Darrell Reardon, Ralph H. Hunt, Ralph J. Brown, James P. Cunningham, Martha A. Yoder Hunt and divers other persons too numerous to mention and all of whose names are to the Grand Jury unknown, did wilfully, unlawfully, feloniously and knowingly conspire, combine, confederate and agree together and with each other, and with the other persons named herein, and with divers other persons too numerous to mention herein and all of whose names are to the Grand Jury unknown, that they would cheat and defraud, by criminal means and to obtain money and property by false pretenses and by false promises with fraudulent intent not to perform such promises, to commit Grand Theft and to violate the Corporate Securities Law of the State of California, as follows:

"(18 Overt Acts Alleged—See footnote No. 4, *supra*.)'"

354

enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. *In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another.*" (Emphasis added.)

▮ These provisions are permissible and directory, and not mandatory. ▮ As stated in *People* v. *Price,* 46 Cal. App.2d 59 at page 61 [115 P.2d 225]:

". . . They do not direct what must be alleged in a pleading but indicate rather broadly the form a pleading may follow."

▮ The use of the words "give the accused notice of the offense of which he is accused" constitutes a clear manifestation of legislative intent that even less than a pleading of the offense in the language of the statute would be sufficient *so long as the accused is given the aforementioned notice.*

It is stated by Judge Fricke in the fifth edition of "California Criminal Procedure" at pages 102-104:

" 'The sufficiency of an indictment or information is not to be tested by the rules of the common law nor by the rules which existed prior to the amendments of 1927 and 1929 of our statutes relating to the pleading in criminal cases. The true rule can be determined only by a consideration of all the statutes affecting the subject as they exist since these amendments. *The purpose of an indictment or information is to inform the accused of the charge which he must meet at the trial.* At common law, where this information came solely from the indictment, much particularity was required . . . *as a part of the accusatory procedure the law now provides that in every case the accused is entitled to a copy of the testimony given before the grand jury* or the committing magistrate as the case may be (§§ 870, 925, Penal Code) *and he is today better informed as to the case he must meet than was an accused under the detailed form of pleading required at common law. By section 959 of the Penal Code as amended in 1927* (Stats. 1927, p. 1041) *we have the statutory provision that an information, indictment or complaint is sufficient if it can be understood therefrom that it is entitled in a court having authority to receive it; that the defendant is named, . . .; that the offense is one of which the court has jurisdiction and that the offense was committed prior to the filing of the information.* The former requirements of subdivisions 6 and 7 of section 959, that the act or omission charged must be clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of

common understanding to know what is intended and to enable the court to pronounce judgment upon conviction were repealed by the 1927 amendment and are no longer a part of that section. Insofar as section 950 of the Penal Code seems to conflict with the rule laid down by section 959, as amended, the latter section must control in view of the evident intent of the legislature to remove the former requirements of subdivisions 6 and 7 by their repeal. Section 952, which formerly required the pleading to set forth the particular circumstances of the offense charged, as amended (in 1927), declares that it (the indictment or information) shall be sufficient if it be ''in any words sufficient to give the accused notice of the offense of which he is accused.'' There, in a nutshell, is stated the principle of pleading a criminal offense—the accused is entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, such detail being furnished him by the transcript of the testimony upon which the indictment or information is founded.' (*People* v. *Beesly,* 119 Cal. App. 82, 84 [6 P.2d 114, 970] ; quoted and followed in *People* v. *Gilbert,* 26 Cal.App.2d 1 [78 P.2d 770] ; *People* v. *Yant,* 26 Cal.App.2d 725 [80 P.2d 506] ; *People* v. *Pierce,* 14 Cal.2d 639 [96 P.2d 784] ; *People* v. *Curtis,* 36 Cal.App.2d 306 [98 P.2d 228] ; *People* v. *Corica,* 55 Cal.App.2d 130 [130 P.2d 164] ; *People* v. *Jones,* 61 Cal.App.2d 608 [143 P.2d 726] ; *People* v. *Gordon,* 71 Cal.App.2d 606 [163 P.2d 110] ; *People* v. *Randazzo,* 48 Cal.2d 484 [310 P.2d 413]) 'Notice of the particular circumstances of the offense is given not by detailed pleadings but by the transcript of the evidence before the committing magistrate or the grand jury' (*People* v. *Roberts,* 40 Cal.2d 483 [254 P.2d 501]). '. . .' Section 952 is constitutional. (*People* v. *Ilderton,* 14 Cal.App.2d 647 [58 P.2d 986].) . . .'' (Emphasis added.)

A similar contention to that being made by appellants in this case, was made in *People* v. *Gordon,* 71 Cal.App.2d 606 [163 P.2d 110]. In the Gordon case, the first count of the indictment charged a conspiracy of the defendants. As appears at page 610 of the opinion:

''. . . [T]hat they 'confederated and agreed together and with each other, and with divers other persons to the grand jury unknown, that they would cheat and defraud by criminal means, and obtain money and property by false pretenses and false promises, with fraudulent intent not to perform such promises, and to commit grand theft.' Following such charge the indictment sets forth 28 overt acts whereby it is alleged

that one or the other or both of the defendants took specified sums of money from the several persons named in the declarations of the overt acts."

The court held that the count charging the conspiracy "is not wanting in any of the essentials of a valid accusation."

In the case of *People* v. *Gilliland,* 39 Cal.App.2d 250 [103 P.2d 179] an attack was made upon Count I of an indictment charging conspiracy to violate the corporate securities law. The attack was made by general and special demurrers. This Court specifically upheld the validity of the indictment. Although the opinion does not set forth the indictment, the context of the aforementioned count, taken from the original record, is set forth in footnote form.[23]

There is no merit to appellants' contention that the indictment is defective. The indictment itself need not allege the victim.

Appellants next contend that Count I is defective in that it fails to allege that the securities sold without a permit required a permit (*i.e.,* that the People must negative in the indictment the exceptions to the Corporate Securities Law).

Where an exception is descriptive of or an element of the offense charged, it must be negatived in the pleading (*People* v. *Priestley,* 17 Cal.App. 171 [118 P. 965]). However, where the exceptions are not a part of the statute defining the offense and constitute a matter of defense, the pleading is sufficient without any allegation showing that the exception does not exist. For cases dealing with the sale of corporate securities without a permit see *People* v. *Murphy,* 17 Cal.App. 2d 575, 587 [62 P.2d 592]; *People* v. *Ratliff,* 131 Cal.App. 763 [22 P.2d 245]; *People* v. *Main,* 75 Cal.App. 471 [242 P.

---

[23]"COUNT I: The said . . . (defendants) are accused by the Grand Jury . . . by this Indictment, of the crime of CONSPIRACY TO VIOLATE THE CORPORATE SECURITIES ACT and GRAND THEFT, felonies, committed prior to the finding of this Indictment, as follows:

"That continuously . . . from about the 1st of November, 1935, to about the time just prior to the finding of this Indictment, in the County of Los Angeles . . . and within the jurisdiction of this court, and prior to the finding of this Indictment, the said defendants, . . . knowingly, willfully, unlawfully and feloniously conspired, combined, confederated and agreed together, and with each other, and with diverse other persons to the Grand Jury unknown, that they would issue and sell, and cause to be issued and sold, for value, shares of the capital stock of 'Dr. W. B. Mayo Laboratories, Inc.,' a corporation, . . . , without first having applied for and secured from the Commission of Corporations of the State of California, a permit authorizing them so to do."

NOTE: Some five overt acts were then alleged.

1078]. No reference to the defensory exceptions need be made in charging the offense.

 Appellants further assert that Count I is defective in that it fails to allege that there was any specific intent to deprive the owners permanently of property under Penal Code, section 182, subdivision 4.

Count I alleged that the appellants conspired ". . . to cheat and defraud by criminal means and to obtain money and property by false pretenses and by false promises with fraudulent intent not to perform such promises, in violation of Section 182, Subdivision 4, Penal Code of California . . ." The language of the indictment, in this respect is similar to the indictment in *People* v. *Gordon, supra,* 71 Cal.App.2d 606, 610, where the indictment was held to be valid.

 As to Counts V, VII, VIII, IX, XI, XV, and XVI (*i.e.,* substantive counts in the indictment dealing with violation of the Corporate Securities Law), appellants again assert that it was incumbent upon the People to negative in the indictment the exceptions to the Corporate Securities Law.

The aforementioned substantive counts set forth in effect that the defendants unlawfully and knowingly sold securities for specified amounts on specified dates to specified individuals and that these securities were shares of stock in specified corporations organized for profit, and that the defendants so acted without first having applied for and secured a permit from the Commissioner of Corporations in violation of Corporations Code, section 26104, subdivision (a). As indicated above, no reference to the defensory exceptions need be made in charging the offense (*People* v. *Murphy, supra,* 17 Cal.App. 2d 575; *People* v. *Ratliff, supra,* 131 Cal.App. 763; *People* v. *Main, supra,* 75 Cal.App. 471; see *People* v. *Sears,* 138 Cal. App.2d 773, 775-776 [292 P.2d 663]).

 Appellants also assert that Count XIV is defective in that it fails to allege an intent to deprive the owner permanently of his property. In Count XIV the appellants were charged with the crime of grand theft in violation of Penal Code, section 487, subdivision 1, in that they unlawfully took a specified sum of money which was the personal property of a specified individual. Penal Code, section 952, specifically provides in pertinent part that:

". . . In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another."

It is settled law in this state that an allegation of an unlaw-

ful taking as in the case at bar is sufficient. (*People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271] ; *People* v. *Corenevsky,* 124 Cal.App.2d 19, 23 [267 P.2d 1048].)

For the foregoing and other reasons, the indictment clearly states acts constituting a public offense.

 Appellants' second contention is that the trial court failed to rule on their motion in arrest of judgment and as a consequence, a new trial is required.

Following the return of the verdicts, defense counsel orally stated that he was making a motion for a new trial and in arrest of judgment. Thereafter, defense counsel filed a ''Memorandum of Points and Authorities in Support of Motion for New Trial and Motion in Arrest of Judgment.'' Paragraph IX of the ''Memorandum'' provides:

''IX

''The indictment is defective and deficient in the particulars and on the grounds heretofore urged before this Court, and the Court lacks jurisdiction over the offenses charged.''

Such contentions are embraced by a motion in arrest of judgment (Pen. Code, §§ 1004, 1185).

The reporter's transcript discloses the following:

''THE COURT: All right. How do you want to proceed, on the motion for new trial first?

''MR. STRONG: I would think so, . . .

''THE COURT: The record will show I have read all the probation reports in both cases; also the memorandum of points and authorities on motion for new trial, and also motion to strike portions of the probation report and for referral of the matters to the Probation Officer.

''We will take them in the order of motion for new trial and the matter of re-referral, and also the matter of probation and sentence, we will take that first if we get that far, and also resetting.

''. . . . . . . . . . . .

''MR. STRONG: In view of the fact that you have received a written memorandum that I have filed in support of my oral argument, your Honor, I don't see any point in my going into the rest of the points because I have made them and argued specifically and generally and you have made some decision on it but your Honor, I feel as to all of the evidence here and all of the things that have been mentioned, that a new trial should be granted as to each defendant on all of the counts.

''THE COURT: *Well, Counsel, I have considered all of your points and authorities and many of these things I have con-*

*sidered during the trial and there were rulings made during the course of the trial.*

"*The motion will be denied.* (Emphasis added.)

" . . . . . . . . . .

"THE COURT: . . .

". . . Is there any legal cause why judgment and sentence should not now be pronounced in this matter at this time?

"MR. STRONG: I have already indicated, your Honor, in the referral motion and I think that is the legal cause. . . .

"THE COURT: Is there anything further?

"MR. STRONG: No.

"THE COURT: There being no legal cause why judgment and sentence should not now be pronounced in this matter, . . ."

The Court then pronounced sentence. From the above it seems clear that the record is consistent with the trial court having passed upon and having denied the motion (*i.e.*, both for a new trial and in arrest of judgment). ▪ As stated in *People* v. *Wissenfeld,* 36 Cal.2d 758 at page 767 [227 P.2d 833]:

". . . 'all intendments and presumptions not contradicted by or inconsistent with the record are in favor of the regularity of the proceedings' in the court below . . ."

▪ Mr. Parsons, the present counsel for appellants, argues in his brief that when the trial court asked if there was any legal cause why judgment should not be pronounced, that trial counsel's statement, "I have already indicated, your Honor, in the referral motion and I think that is the legal cause . . ." was with reference to the motion in arrest of judgment. The record clearly does not support appellants' contention. The so-called "referral motion" was with reference to a re-referral of the probation report to the probation department.

Appellants' third contention is directed to the purported misconduct on the part of the district attorney during closing argument.

▪ It is stated in *People* v. *Lyons,* 50 Cal.2d 245 at page 262 [324 P.2d 556]:

". . . Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved. Previous authority is of little help."

▪ Appellants assert prejudicial misconduct in that the prosecutor accused defense counsel of the most malicious,

vicious, deliberate attempts to mislead the jury, of misstating the evidence and misquoting the prosecuting attorney's argument; and also that the prosecutor misquoted defense counsel. The reporter's transcript discloses the following:

"Mr. Mayerson: May it please the Court, and ladies and gentlemen of the jury, there is one thing that Mr. Strong and I agree upon, and that is that the burden of proving any one guilty of the crimes charged against him must be proved by the People beyond a reasonable doubt; and it is because we have that burden that I have this opportunity to make what is called the closing argument in summation to you. . . .

"I have listened to Mr. Mason—excuse me—Mr. Strong—to Mr. Strong, and I think that I am as aware as you of his eloquence and his impassioned plea on behalf of his clients, but, ladies and gentlemen, passion and eloquence are not substitutes for accuracy.

"I propose in this opportunity given to me to answer Mr. Strong to show you what in my experience has been the most malicious, vicious, deliberate attempts on the part of a lawyer in a closing argument to mislead the jury in misstating the evidence, in misquoting my argument that I have ever had the displeasure of hearing.

"But, before I begin with that, if I may be permitted a moment to tell a story that I like, it comes to my mind because of a remark that Mr. Strong made. He said towards the end of his remarks that perhaps we have shown a technical violation of an unclear law.

"Mr. Strong: I do not recall making any such admission, your Honor.

"The Court: No. There was no statement made like that in those words that I recall.

"Mr. Mayerson: Well, your Honor——

"The Court: *The jury will disregard that statement.* (Emphasis added.)

"Mr. Mayerson: Well, as I understood the remarks,——

"The Court: Well, now, you may have inferred many things, but you made that as a quote. It is not a quote of any such fact that I am aware of.

"Mr. Mayerson: Well, this has happened so short a time ago that I am sure you remember that Mr. Strong spoke of the law, and he said, 'It is unclear, you could not find anybody guilty of a technical violation.'

"Now, if that is much different from what I said before, ladies and gentlemen, I ask is Mr. Strong suggesting to you

that if the requirement for a permit before the sale of a stock is permitted in this state is a technical law, and if you find that the defendants did violate the law that you must find them not guilt (*sic*) because the law is unclear and, as he said, you would not know today if you could go out and sell your stock.

"That is the point I am making. Is Mr. Strong asking you to violate your oath to apply the law coldly and dispassionately to every person whether it be a technical law or not?

"Well, this is a technical law. I submit the evidence here has proved beyond a reasonable doubt that it was violated.

"But the story that I wanted to tell you about I think is a whole lot more amusing than Mr. Strong's suggestion that if you feel this is merely a technical law and that it is unclear so that you would not know what to do with your own stock, you should ignore the law or find the defendants not guilty merely because it is a technical law."

It is to be noted from the portion of the reporter's transcript reproduced above, that no objection was interposed by counsel to Mayerson's remarks to the effect that defense counsel made a malicious, vicious, etc. attempt to mislead the jury. Further, when Strong (defense counsel) took exception to the purported admission by him of a technical violation of the law, the trial judge agreed with Strong and expressly admonished the jury to "disregard that statement." Furthermore, Strong in his closing argument to the jury did in fact make reference to the law as being "unclear and technical."

As appears from the reporter's transcript, during Strong's closing argument:

"MR. STRONG: . . .

"Let me tell you something. If the law is so complicated and confusing about all that, you should not convict in any instance. If you are going to convict somebody of a major crime, the law ought to be clear; and the law ought to tell you precisely so you can know what you can do and what you cannot do.

". . . 'It gets technical. People get prosecuted because of technicalities. I would like to know about these technicalities.'

"If the law is that indefinite, how can you conclude that whatever the proof is proves beyond a reasonable doubt that there was a definite violation, that there was an understandable violation, that there was something that somebody could really grasp at and clearly understand? Not only is the

proof confused here, but when you hear what the law is you try to figure it out, too. See if you do not come up with different versions the more you talk about it and the more you discuss it. That is a basis for a conviction of a felony?"

A circumstance militating against any claimed prejudice is that remarks of a similar nature have been exchanged. *During defense counsel's closing argument* it was intimated and stated among other things, that the prosecuting attorney had presented matter which may have been ". . . deliberately calculated to confuse people"; had insulted ". . . the intelligence of anybody who sees and listens to the evidence here"; that the prosecution is ". . . trying to befuddle you in any way they can and to confuse you any way they can . . ."; that the prosecution was guilty of "extremely bad faith"; that the prosecution made a ". . . deliberate and conceived effort to mislead you to take your mind off the issues in this case, . . ." There was no prejudicial misconduct on the part of the prosecutor under the circumstances.

 Next, appellants complain of the prosecuting attorney's reference in his closing argument to a count which had been dismissed. Defense counsel had criticized the prosecutor for his failure to make an opening statement. The reporter's transcript discloses that the following took place during the prosecution's closing argument:

"Now, let me start at the beginning of Mr. Strong's argument. He said that there is so much confusion in the evidence and in my argument or in the fact I did not make an opening statement. Now, I wonder what he wanted in an opening statement? That I might say, 'We anticipate showing that stock was sold to William Teter without a permit by the defendants, or that stock was sold to Mr. Kirkland without a permit, or to Mr. Yoder without a permit.' I might have done that, and I might have come to the area of this indictment where there were—Count 17 I might have said that, '*We will show that stock was sold to Dr. Frank Hombach without a permit.*' (Emphasis added.)

"Mr. Strong: *That is assigned as prejudicial misconduct.* (Emphasis added.)

"The Court: *The jury will disregard the statement made by counsel respecting the sale to one Dr. Frank Hombach.* (Emphasis added.)

Mr. Mayerson : *I am merely,* ladies and gentlemen, *pointing out to you that I may have referred to a count in this indictment on which we would present no evidence,* and then Mr.

Strong would stand up and say, 'Ah, you see, he promised to show this, but he did not show you that,' and, therefore, I would have been a liar in my opening statement. . . .'' (Emphasis added.)

From the transcript, it appears clear that the trial judge ordered the jury to disregard the statement relative to Dr. Hombach, and further the prosecuting attorney indicated that no evidence had been presented relative to the count in question. Earlier in the trial, the prosecutor had stated that no evidence was being offered respecting Count XVII and the court granted his motion to dismiss, instructing the jury that the count was no longer before it for its consideration. In view of the court's admonitions to the jury and of the circumstances that the prosecution was merely referring to the matter by way of illustration to explain why (in response to defense counsel's challenge) he had not made an opening statement, and was not referring to the matter as having been proved, it appears clear that the remark (which was stricken) did not constitute an argument of guilt as to the dismissed count and that no prejudice appears.

 Appellants next complain of the prosecuting attorney's statement in his closing argument wherein he submitted that a witness had been coached by reason of the wording of an objection interposed while the witness was under cross-examination by the People. The transcript provides in pertinent part as follows:

"Now, Mr. Strong originally asked the witness about stamps. On cross examination I asked—I was asking Mr. Gray some questions about the certificates, and I came upon the certificate that is made out to Clyde Moslander, Jr., which is Exhibit C-6, and I asked the question, 'This certificate is not endorsed, is it?'

" 'That is correct.'

" . . . . . . . . . . .

" 'Q. It has a word ''cancelled'' stamped on it.

" 'A. That is right.

" 'Q. There is no Government stamps on it, is there?'

"Mr. Strong has asked about government stamps. On this one I say, 'There is no Government Stamps on it, is there?'

"Mr. Strong objects that it is irrelevant and immaterial. Now, you can object any time you want to, any lawyer is entitled to and, if he believes that it is a proper objection, it is his duty to; but you make the objection.

"Mr. Strong adds, '*As counsel knows, you can put stamps on the certificates or the stubs.*' (Emphasis added.)

"Now, I asked Mr. Gray, 'Do you know, Mr. Gray, whether or not there were any stubs put on any—any stamps put on the stub to Certificate Number 974?'

" 'A. Personally I don't know on that particular certificate, but I have seen stamps on the stubs.'

"*I submit,* ladies and gentlemen, *that that is coaching the witness right in front of your eyes. By Mr. Strong making the objection, saying that I know the fact, the witness knows what answer he is to give. That is what I see in this record,* ladies and gentlemen.' (Emphasis added.)

"Mr. Strong: I think, your Honor, I am entitled to protest when counsel makes statements like that, and I would like to do it for the record. I think it is outrageous, your Honor, just outrageous...."

A prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom (*People* v. *Burwell,* 44 Cal.2d 16, 39-40 [279 P.2d 744]), and he may comment as to the manner in which a witness testifies. (*People* v. *Rossi,* 37 Cal. App. 778, 782-783 [174 P. 916].) As stated in Judge Fricke's work on Criminal Procedure at page 311:

"Arguments to the jury must be based upon the evidence adduced at the trial, the absence or lack of evidence and the legitimate inferences and conclusions to be drawn therefrom and *may include a discussion of the credibility and reliability of testimony and evidence.*" (Emphasis added.)

In conjunction with the matter above set forth, appellants complain of the prosecutor's statement in his closing argument to the effect that defense witnesses had testified to a pattern of things which could not be true for the purpose of creating a false defense. An objection was made and the court directed the prosecutor to proceed. In accordance with the authorities heretofore cited, no prejudice appears.

During opening argument, the prosecuting attorney had alluded to a number of documents presented on behalf of appellants, then to one of the defenses to a charge of violating the Corporate Securities Law, and then to Gray's testimony relative to his sale of stock to certain individuals. The transcript discloses the following:

"Mr. Strong: I want to object, your Honor, because the documents have nothing to do with the crime involved here

and your Honor expressly limited that to impeachment purposes.

"Mr. Mayerson : Exactly true. That is why I didn't understand why they came into evidence, and I can explain exactly what they mean.

"Mr. Strong : Counsel is saying this is part of the crime.

"Mr. Mayerson : I haven't finished my statement.

"The Court : You are explaining a violation of the Corporate Securities Act, the defense to it. I will sustain the objection.

"Mr. Mayerson : I am explaining it in the abstract, your Honor, not for these particular documents."

The gist of Mayerson's further argument was that Gray had been impeached. In the light of the fact that the court sustained the objection and the subsequent explanation by the prosecuting attorney and further that no objection was made to any further remarks, no prejudice appears.

Appellants' fourth contention is directed to the purported insufficiency of the evidence to support each count upon which they were convicted.

As indicated in *People* v. *Mills, supra,* 148 Cal.App. 2d 392, 404-405:

"The rule governing a court of review with respect to sufficiency of the evidence is stated in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] : 'The court on appeal "will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground" of insufficiency of the evidence, "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with

the innocence of the defendant will not warrant interference with the determination of the jury.''

Insofar as the conspiracy is involved (*i.e.*, Count I), what was said in *People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17] is pertinent. ■■ ■■ It is stated at pages 237-238 as follows:

''As a general rule, a conspiracy can only be established by circumstantial evidence 'for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal.Jur. 521); and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority).' (*People* v. *Sampsell,* 104 Cal. App. 431, 438-439 [286 P. 434].) ■■ However, before evidence of the acts and declarations of an alleged coconspirator is admissible against the other, the fact of the conspiracy must be proved. (Code Civ. Proc., § 1870, subd. 6.) In recognizing the application of this rule of evidence in a criminal case, it was said in *People* v. *Talbott,* 65 Cal.App.2d 654, at page 663 [151 P.2d 317] : '. . . the fact of the conspiracy must be proved before the evidence of said acts or declarations may be considered. The issue, however, need be proved only to the extent of establishing prima facie evidence of the fact. . . .' '' (See *People* v. *Little,* 41 Cal.App.2d 797, 804 [107 P.2d 634, 108 P.2d 63].)

*People* v. *Mills, supra,* 148 Cal.App.2d 392, 404, involved a charge of violating the Corporate Securities Law and a defense, similar to the one in the case at bar relative to the corporate security counts, was interposed. ■■ At page 406 of the Mills case, the court in quoting from *People* v. *Goldstein,* 136 Cal.App.2d 778, 785 [289 P.2d 581], stated:

'' 'It is true in a criminal case as in civil actions that a statement against interest made by a party *constitutes original and independent evidence of the facts so stated.*' '' (Emphasis added.) ■■ It is also noted in the Mills case, *supra,* at page 407 that, ''. . . an offer or an attempt to make a sale comes within the statutory definition of sale.'' (See Corp. Code, § 25009, subd. (a).)

■■ As to the crime of theft by false pretenses, the intent to defraud is a question of fact to be determined from all the facts and circumstances, and the inference of reliance on

the part of the victim may be drawn from all the evidence. It is not even essential that the victim expressly testify that he was induced to part with his money or property by the fraudulent statements of the accused. (*People* v. *Frankfort,* 114 Cal.App.2d 680, 697-699 [251 P.2d 401].)

 It cannot be said as a matter of law that the trier of fact was unwarranted in drawing an inference of awareness and tacit approval on the part of Jeanne Mason as to her husband's (Monte G. Mason) representations; the jury could reasonably infer that appellants were linked together in inducing the purchase of stock through extravagant representations and that the sales of stock were not made for the account of the vendor, but rather for the benefit of the corporations, with the intent of evading the corporate securities law, thereby removing the transactions from the exception of Corporations Code, section 25152; the jury could infer that Cunningham played a vital role in appellants' enterprises, and that a conspiracy on the part of at least the three could reasonably be deduced and that appellants were associated in committing the substantive acts under consideration. From the evidence, it could be inferred that the stock was not being disposed of for the owner's own account, but rather that substantial portions of the proceeds were being applied for corporate uses.

There is additional evidence that the sales of stock did not come within the exception of Corporations Code, section 25152. The record reflects a number of instances in which funds for the purchase of stock were made payable or directed to Modco, Inc., or to Glenn and Parent or Robert Parent, Trustee, and in which money from the Parent, Trustee account was endorsed over to Modco through utilization of money orders which, in various instances, bore the endorsement of one appellant or the other.

The facts as heretofore set forth answer appellants' contention with reference to insufficiency of the evidence.

 As one of their separate points under this contention, appellants argue that they could not properly have been convicted of conspiracy inasmuch as a husband and wife alone cannot be found guilty of conspiracy. (*People* v. *Little, supra,* 41 Cal.App.2d 797 and cases cited therein.)

Count I of the indictment charged that appellants, together with several other specified persons and with a number of unknown persons, did ". . . wilfully, . . . conspire, combine, confederate and agree together and with each other, and with the other persons named . . . and with diverse other

persons too numerous to mention . . ." As heretofore shown, reasonable inferences or participation with appellants could be drawn relative to at least one of the other specified persons. Under these circumstances appellants were properly charged and found guilty. (*People* v. *Richards,* 67 Cal. 412, 418-419, 421-422 [7 P. 828, 56 Am.Rep. 716].) ▆▆▆ As stated in 11 Cal.Jur.2d, Conspiracy, section 18, page 238:

"A husband and wife cannot be prosecuted for a criminal conspiracy of which they are the only members. *But this rule is not applicable where one or more other persons join with the husband and wife.*" (Emphasis added.)

Next, in relation to Count I, appellants contend that there is no substantial evidence to support the truth of the allegations in Overt Acts Number 13, 14, 17 or 18. The record clearly supports the allegations contained in the aforementioned "Overt Acts."

Appellants next assert that the evidence pertaining to Overt Acts 11 and 12 constituted admitted hearsay.

In his opening argument to the jury the prosecuting attorney conceded among other things that neither Overt Acts 11 nor 12 had been proved.

▆▆▆ Next, it is contended that it was improper to have received evidence in support of overt acts which were beyond the statute of limitations, and that the Court failed to instruct the jury that the evidence as to all Overt Acts except 13, 14, 17, and 18 was not to be considered.

In answer to the last mentioned contentions, the record discloses that during argument to the jury, the prosecuting attorney stated that none of the alleged overt acts had been proved except those numbered 1 through 4, 8, 13, 14, 17 and 18, which he discussed in some detail. He also called attention to the circumstance that the indictment was returned December 16, 1957, and that it was necessary for an overt act to have taken place within three years prior to the issuance of the indictment to comply with the statute of limitations. The trial court likewise instructed the jury[24] as to the necessity of finding the commission of an overt act within three years prior

---

[24]"No agreement amounts to a conspiracy punishable in California unless in addition to entering into the unlawful agreement, *an overt act is done within the state* by one or more of the conspirators for the purpose of accomplishing the object of the agreement. The law requires that at least one of such overt acts be expressly alleged in the indictment and that in addition to proof of the criminal agreement between the parties, *at least one of the overt acts thus alleged must be proved to support a conviction for conspiracy.* But it is not necessary to the guilt of any particular defendant that he directly committed the overt act himself, if he was

to the filing of the indictment and that such act must have been one of those expressly alleged in the indictment. ▮ As to the admissibility of evidence of overt acts which were outside the statute of limitations, what was stated in *Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 184-185 [281 P.2d 250], is applicable:

"Proof that one of the overt acts in furtherance of the conspiracy occurred after the time before which the statute of limitations would be a bar is sufficient, and evidence of acts occurring before that time may be received to show the conspiracy. (*People* v. *Gordon,* 71 Cal.App.2d 606, 629 [163 P.2d 110].)"

▮ It would appear that the jury was adequately informed as to what alleged overt acts the People were relying upon and as to the necessity of finding one of them to have been committed within the period of limitations.

The allegations of the overt acts upon which the People were relying satisfactorily met the requirements of Penal Code, section 184, that is, that some act be done within the state, aside from the agreement itself, to effect the object of the conspiracy by one of the parties thereto.

▮ While evidence of out-of-state activities is relevant to show the object of a conspiracy (*People* v. *Buffum,* 40 Cal. 2d 709, 720 [256 P.2d 317]; *People* v. *Keller,* 165 Cal.App.2d 419, 427-428 [332 P.2d 174]), the jury was adequately instructed that before it could find appellants guilty as to any count it must find beyond a reasonable doubt that the particular offense was committed in California. The instruction given was one required by the defendants (appellants).[25] Clearly, appellants' rights were protected.

▮ Finally, appellants contend that Count I should fail because "the jury did not return any verdict showing which, if any, other alleged co-conspirator was found to be guilty of conspiracy."

one of the conspirators when such an act was committed and *the overt act was committed within three years prior to the filing of this indictment.* (Emphasis added.)

"The term 'overt act,' as used in the law of conspiracy, means . . ."

[25]"DEFENDANTS' INSTRUCTION NO. W-1:

"As to each and every count of the indictment if you decide there is sufficient proof beyond a reasonable doubt to convince you that the offense charged was committed, you must then decide beyond a reasonable doubt whether the offense was committed in California or in another state. If you do not find beyond a reasonable doubt that the offense was committed in California, you must find defendants *not guilty* of that particular offense."

Penal Code, sections 1150 and 1151, provide as follows:

"Section 1150. Authority to render general or special verdict; exception.

"*The jury must render a general verdict,* except that in a superior court, when they are in doubt as to the legal effect of the facts proved, they may, except upon a trial for libel, find a special verdict." (Emphasis added.)

"Section 1151. General verdict; forms.

"*A general verdict upon a plea of not guilty is either 'guilty' or 'not guilty,' which imports a conviction or acquittal of the offense charged in the accusatory pleadings. . . .*" (Emphasis added.)

The jury returned verdicts of "guilty" in conformity with the requirements of the aforementioned Penal Code sections.

■■■■■ Appellants' next contention is directed to the purported insufficiency of the evidence to support the verdict of "guilty" as to Count XIV (*i.e.,* grand theft). See the "Angus C. McBain Transactions," *supra.*

Appellants' contention in substance is that McBain relied upon his own investigation of whether the well was in "production" and that the execution of the satisfaction was not the result of the representations made to him. From the circumstances, the jury could well infer that McBain was interested in investing in a commercially productive well; that neither he nor his friends were especially experienced in oil matters, and that in executing the satisfaction of the chattel mortgage, he was motivated principally by the representation that the well was now in production. Production meaning "commercial production" and that his visit to the well site was not sufficient to put him on notice that the well was not in fact commercially productive.

Relative to the corporate securities counts, appellants contend that since the jury found appellants "not guilty" of Counts II and III, and could not arrive at a verdict as to Counts IV, X, XII, XIII, and XIX, that therefore, the evidence was insufficient to support the verdicts of "guilty" as to Counts V, VII, VIII, IX, XI, XV, and XVI.

■■■■■ It was stated in *People* v. *Villa,* 156 Cal.App.2d 128 [318 P.2d 828] at page 133 that:

". . . Section 954 of the Penal Code provides, in its last sentence: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' Under this section, each count charging a separate and distinct offense must stand or fall on its own merits. The disposition of one count has no

effect or bearing upon the other counts. This is so even though the respective verdicts in the various counts may be logically inconsistent. (*People* v. *McCree*, 128 Cal.App.2d 196 [275 P.2d 95]; *People* v. *Codina*, 30 Cal.2d 356 [181 P.2d 881]; *People* v. *Ranney*, 123 Cal.App. 403 [11 P.2d 405].) . . . The jury was entitled, indeed obligated, to treat each count separately.''

Appellants' fifth contention is that the trial court ''lacked territorial jurisdiction.'' Appellants stated in their brief:

''To analyze these transactions, and not to repeat, the evidence plainly shows that Mason met some of these people in California; there were discussions here, but the people went to Utah; examined the property, and any stock that was purchased was done by forwarding the money to a firm of accountants in Colorado. It appears that the transactions were completed beyond the boundaries of California; that most of the activity between Mason and these people was conducted in Utah; therefore, we say that California could not prosecute for an offense, if any, which was committed beyond its boundaries.'' The appellants rely upon *People* v. *Buffum, supra,* 40 Cal.2d 709, 715, which held that a conspiracy to commit a crime in another jurisdiction was not punishable in California. However, the court went on to state at page 720 that:

''. . . an offense was completed when the agreement was followed by acts in this state (citation), . . . (and the acts outside of California) did not operate to nullify the acts which had already been done in California.''

Appellants' contention is not supported by the record. The proscribed conduct took place as soon as appellant Monte Mason offered or attempted to sell stock in California. (Corp. Code, § 25009, subd. (a).) As reflected by the record, such acts of sale as well as the acts culminating in the defrauding of McBain took place within the state, principally at meetings with prospective purchasers. Since the essential acts charged took place in California, the trial court had jurisdiction. (*People* v. *Rankin,* 169 Cal.App.2d 150, 163-164 [337 P.2d 182]; *People* v. *Keller, supra,* 165 Cal.App.2d 419, 427-428.)

Appellants' sixth contention is divided into several points.

First, it is asserted that appellants were denied a fair trial in that the trial court erred in giving the instructions on conspiracy. This contention is predicated upon the assumption that there was no substantial evidence of a conspiracy. Having already determined that there was substan-

tial evidence, this contention has been answered. (*People* v. *Gardner*, 147 Cal.App.2d 530, 537 [305 P.2d 614].)

Next, appellants contend that the instruction given by the trial court relative to a conspiracy between husband and wife was "confusing, and only tended to stress upon the jury that there was a conspiracy between the defendants, husband and wife."

The instruction which was given is as follows:

"Before you can find a conspiracy between the defendants here, it would be necessary for you to find that some third person named in the indictment as a co-conspirator, was also guilty of conspiring with the defendants in the manner charged against them in Count I."

The instruction which was offered by defendants (appellants) and refused is as follows: "A conspiracy cannot be formed where the sole parties to the agreement are husband and wife. (Citations.)" The instruction as given correctly reflects the law and appellants' contention is at best specious. However, see *United States* v. *Dege* (1960), 364 U.S. 51 [80 S.Ct. 1589, 4 L.Ed.2d 1563] where the court held that a husband and wife do not fall outside the scope of a conspiracy statute. The court said in effect that criminal statutes must not be construed by artificial and conventional rules and that we must "not allow ourselves to be obfuscated by medieval views regarding the legal status of woman and the common law's reflection of them." The court further stated that when it is considered that legitimate business enterprises between husband and wife are commonplace in our time "it would enthrone an unreality into a rule of law to suggest that man and wife are legally incapable of engaging in illicit enterprises and therefore, forsooth, do not engage in them."

Next, it is contended that the trial court erred in refusing to give their requested instruction as follows:

"DEFENDANTS' INSTRUCTION No. F-1:

"There is no illegality in the making of a loan by a stockholder to a corporation, even if the funds so loaned are the proceeds of a sale of the personally owned stock of said stockholder. (Citation.)"

The trial court did instruct the jury in accordance with the provisions of Corporations Code, section 25152, advising them that the provisions of the Corporate Securities Law did not apply to a sale of securities on behalf of the vendor who was not the issuer but was a bona fide owner of the securities and was disposing of his own property for his own account, and

the sale was not made directly or indirectly for the benefit of the issuer. Clearly, the matter was thereby sufficiently covered. This also disposes of appellants' contention that the court erred in refusing to give the instruction to the effect that a bona fide owner of securities may dispose of his property for his own account.

Appellants then assert that the trial court erred with reference to instructions pertaining to acts outside the state. They complain that the court refused to give the following two requested instructions:

"DEFENDANTS' INSTRUCTION No. I-1:

"A California court does not have jurisdiction to punish defendant for a crime committed outside of California. (Citations.)"

"DEFENDANTS' INSTRUCTION No. G-1:

"To constitute a conspiracy within subd. 1 of section 182 the crime which is the object of the conspiracy must be a crime to be committed within this state (*People* v. *Buffum*, 40 Cal.2d 709 [256 P.2d 317]). That means that in such a prosecution, the prosecutor must prove not only that the conspiracy was to commit the crime, but also that the crime was one agreed to be committed within this state."

As to the court's refusal to give the former instruction (*i.e.*, defendants' instruction No. I-1), the court gave an instruction concerning the out-of-state activities. (See footnote No. 25.) The instruction given by the court adequately covered the point.

As to the court's refusal to give the latter instruction (*i.e.*, defendant's instruction No. G-1), appellants assert that the court erroneously gave instead an instruction referring to Penal Code, section 778a, as follows:

"Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state such person is punishable for such crime in this state in the same manner as if the same had been committed entirely within this state.

"Section 778a, Penal Code."

In support of their contention, appellants cite *People* v. *Buffum, supra,* 40 Cal.2d 709 and *People* v. *Aragon,* 154 Cal. App.2d 646 [316 P.2d 370]. As stated by the court in the Buffum case, *supra,* at page 716:

"Section 778a of the Penal Code should . . . be construed as applying only where the acts done within the state amounted (at least) to an attempt."

In view of the fact that the evidence in this case weighs heavily in favor of guilt by reason of the acts committed within this state which constituted completed offenses, and in view of the court's instruction as is set forth in the footnote and that the jury was instructed to consider all the instructions as a whole and each in light of the other, it would appear that the jury was not under any misapprehension in evaluating the evidence.

Appellants' sixth contention is directed to the purported misconduct by the prosecution *which occurred during the trial* (*i.e.,* as distinguished from those matters discussed under their third contention which were directed to purported misconduct during *closing argument*).

During cross-examination of Gray by the District Attorney, Strong, defense counsel, interposed an objection. The transcript discloses the following:

"MR. STRONG: Object to that as irrelevant and immaterial. As counsel knows you can put stamps on the certificates or the stubs.

". . . . . . . . . . .

"(Answer by Mr. Gray): Personally I don't know on that particular certificate, but I have seen stamps on the stubs.

"Q. On the stubs? A. Yes.

"Q. Mr. Gray, do you take a cue for your answer from gestures made by Mr. Strong?

"MR. STRONG: *I cite that as misconduct.*

"THE COURT: Counsel, we will have no remarks like that *and the jury is to disregard it. Counsel has a right to make objections and the witness has a right to testify.*" (Emphasis added.)

This does not constitute the type of misconduct which is irreparable (*i.e.,* which cannot be cured by an admonition). The jury was instructed to disregard the remark and it is presumed that they followed the admonition.

Lastly, it is contended that the prosecuting attorney made an improper attack on a defense witness during rebuttal. During the examination of Mrs. Helm, the record discloses the following:

"Q (by Mr. Mayerson): Now, regarding that statement by Mr. Gray to you that the well that had come in was not on the Americol property but the next one would be drilled on the

Americol property, did you, before you gave to Mr. Gray your check or checks, know that that well had not been drilled on the Americol property?

"Mr. Strong: Object to that, irrelevant, immaterial.

"The Witness: No.

"Mr. Strong: This is not proper impeachment, your Honor.

"The Court: *The answer may go out.*" (Emphasis added.)

Proceedings were then held at the bench out of the hearing of the jury at which time the trial court rejected the prosecuting attorney's offer of proof.

Since the trial court sustained the objection and one of the instructions given by the court concerned the matter that the jury must disregard matter stricken, this contention is devoid of merit.

The record before us shows that the appellants were given every protection which the law affords. They were fairly tried and convicted upon evidence which sustains the verdict.

For the reasons stated the purported appeal from the order denying the motion in arrest of judgment is dismissed and the order denying the motion for a new trial and the judgment are and each is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied September 30, 1960, and appellants' petition for a hearing by the Supreme Court was denied October 26, 1960.